**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
MYUNG SEOB LEE and PYUNG IL SUH,

                        Plaintiffs,

      -against-

JOHN KIM and SONIA KIM,

                        Defendants.
----------------------------------------------------------X

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

12-CV-316 (RER)

**RAMON E. REYES, JR., U.S.M.J.:**

## INTRODUCTION

Myung Seob Lee ("Lee") and Pyung Il Suh ("Suh") (collectively, "Plaintiffs") commenced this lawsuit against John and Sonia Kim (collectively "Defendants") for wage and hour violations under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.,* and New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 650 *et seq.*, N.Y. Comp. Codes R. & Regs. tit. 12, §142-2.2 *et seq*.

The Court held a bench trial from June 16-17, 2013. Plaintiffs called two witnesses as part of their case-in-chief. Specifically, Lee and Suh testified to their respective work schedules, responsibilities, and terms of employment. Defendants moved for a judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure[1] ("Rule 52(c)") at the close of Plaintiffs' case.

After considering the evidence adduced at trial and the parties' respective arguments, I granted Defendants' motion for a judgment on partial findings on July 1, 2013, and indicated that

---

[1] Although Defendants' counsel moved to dismiss Plaintiffs' claim for a lack of jurisdiction (6/19/2013 Tr. at 202:8-203:4; Dkt. No. 33), the Court deems this application a motion for judgment on partial findings under Rule 52(c).

I would issue findings of fact and conclusions of law shortly thereafter. These findings of fact and conclusions of law follow.

## **FINDINGS OF FACT**

1. Sonia Kim owns a residential apartment complex (the "complex") located at 37-76 62nd Street, Woodside, NY. (Dkt. No. 5, Verified Answer, ¶ 6.)

2. The complex is a four-story residential building with thirty-nine apartment units, including a basement apartment. (6/18/2013 Tr. at 11:9-13.)

3. Lee was hired by Defendants to work as a superintendent in the complex beginning on May 1, 2009. (6/18/2013 Tr. at 10:1-2.) In 2009, Defendants paid Lee $250 per week. (6/18/2013 Tr. at 9:14-17.) Defendants raised Lee's pay to $300 per week in 2010. (6/18/2013 Tr. at 75:18-20.) In addition to his weekly wages, Lee was provided a basement apartment, parking space, and utilities allowance. (6/18/2013 Tr. at 9:6-11.) Lee agreed to these employment terms at an April 2009 meeting with Defendants. (6/18/2013 Tr. at 7:25-8:5; 8:20-9:3.)

4. Lee worked from approximately 6:00 AM or 7:00 AM to 10:00 PM or 11:00 PM, Monday through Saturday. (6/18/2013 Tr. at 10:8-10; 6/18/2013 Tr. at 90:22-91:3.) On Sundays, Lee left the complex from 8:30 AM to 12:30 PM to attend religious services. (6/18/2013 Tr. at 45:6-46:2.) Lee abbreviated the performance of his daily tasks on Sundays, due to the time he spent away from the complex. (6/18/2013 Tr. at 95:6-16.)

5. Lee's responsibilities included "cleaning, management and whatever I was told to do." (6/18/2013 Tr. at 9:24-26.) At Defendants' direction, he monitored the boiler and cleaned the building premises, hallways, basement, and lobby daily. (6/18/2013 Tr. at 11:2-8;

(6/18/2013 Tr. at 12:6-10.) Lee also separated recycling and garbage daily. (6/18/2013 Tr. at 25:11-26:13.) On sanitation collection days, Lee would place the garbage outside of the complex for curbside collection. (6/18/2013 Tr. at 31:16-19.)

6. In addition to his daily tasks, Lee performed other maintenance services for Defenants. Lee painted apartment interiors when there was tenant turnover, and he occasionally painted common areas in the complex, such as the lobby and corridors. (6/18/2013 Tr. at 30:17-21; 6/18/2013 Tr. at 30:22-31:2.) In the summer, Lee exterminated pests using a chemical spray. (6/18/2013 Tr. at 33:16-22.) Lee also cured New York City Department of Housing Preservation and Development violations ("HPD Violations"). (6/18/2013 Tr. at 36:5-24.)

7. Lee spent a portion of each workday responding to tenants' maintenance requests. (6/18/2013 Tr. at 33:9-15.) Tenants lodged such requests by visiting Lee in the basement "super office" or by telephone. (6/18/2013 Tr. at 12:15-19.) A sign on the basement door indicated that Lee was available from 7:00 AM until 10:00 PM, and the sign also bore Lee's cellular phone contact information. (6/18/2013 Tr. at 13:5-23; Pls.' Exh. 1; Ct. Exh. 1.) Lee remained on the premises during these "business hour[s]." (6/18/2013 Tr. at 12:20-24.) In emergency situations, tenants contacted Lee outside of the prescribed business hours. (6/18/2013 Tr. at 44:1-21.) Lee also occasionally collected rent from tenants. (6/18/2013 Tr. at 56:6-16.)

8. At an undetermined point during his tenure as superintendent, Lee installed an eight-camera surveillance system in the complex. (6/18/2013 Tr. at 41:7-19.) Lee monitored these surveillance cameras from 8:00 PM to 11:00 PM. (6/18/2013 Tr. at 42:19-22.)

Defendants did not direct Lee to monitor the surveillance cameras. (6/18/2013 Tr. at 42:25-43:3.)

9. John Kim occasionally supervised Lee's work. For instance, John Kim instructed Lee to cure certain HPD Violations. (6/18/2013 Tr. at 36:5-24.) Lee would also call John Kim if there was a building emergency he was unable to handle on his own. (6/18/2013 Tr. at 134:16-20.) John Kim would then contact an appropriate professional to provide emergency repairs. (6/18/2013 Tr. at 134:21-135:7.)

10. Lee resigned his position on December 31, 2010, after approximately twenty months of employment. (6/18/2013 Tr. at 10:6-7.)

11. Suh was hired by Defendants to replace Lee beginning on January 1, 2011. (6/19/2013 Tr. at 168:8-9.) Suh was paid $250 per week to perform maintenance and cleaning tasks in the complex. (6/19/2013 Tr. at 166:7-22.) Defendants required Suh to pay $25 in weekly tithes to John Kim's church. (6/19/2013 Tr. at 167:14-16; 186:15-21.) In addition to his weekly wages, Suh was provided a basement apartment in the complex. (6/19/2013 Tr. at 167:3-10.) Suh agreed to these employment terms at a November 2010 meeting with Defendants. (6/19/2013 Tr. at 165:7-22.)

12. Suh worked from approximately 7:00 AM to 10:00 PM, seven days a week. (6/19/2013 Tr. at 166:21-24; 171:6-17.) On Sundays, Suh was required to attend John Kim's church from approximately 10:30 AM to 2:00 PM. (6/19/2013 Tr. at 186:8-23.)

13. Suh performed the roughly the same daily tasks as Lee. (6/19/2013 Tr. at 172:7-175:12; 177:14-21.) As with Lee, Suh responded to tenant complaints, performed routine building maintenance, sorted garbage and recycling, and sprayed pesticide. (6/19/2013

Tr. at 179:10-180:20; 181:17-184:25.) Suh also waterproofed apartments and repaired roof leaks. (6/19/2013 Tr. at 182:6-23.)

14. Sonia Kim typically traveled to the complex to pay Suh on Saturdays. (6/19/2013 Tr. at 196:17-24; 197:13-25.) At times, both Sonia and John Kim would visit the complex to supervise Suh. (6/19/2013 Tr. at 196:25-197:7.)

15. Suh was terminated by Defendants on September 18, 2011, but he continued working in the complex until October 1, 2011. (6/19/2013 Tr. at 168:20-25.)

16. During the course of his employment, Suh was Defendants' only employee. (6/19/2013 Tr. at 205:2-4.)

## CONCLUSIONS OF LAW

### I. Judgment on Partial Findings Under Rule 52(c)

Rule 52(c) provides as follows:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

FED. R. CIV. P. 52(c); *see Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 194 (2d Cir. 1996). Rule 52(c) "authorize[s] a dismissal at the close of the plaintiff's case if the plaintiff ha[s] failed to carry an essential burden of proof." *LaMarca v. U.S.*, 31 F. Supp. 2d 110, 123 (E.D.N.Y. 1998); *see Pub. Patent Found., Inc. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 801 F.

Supp. 2d 249, 255 (S.D.N.Y. 2011); *Wechsler v. Hunt Health Sys. Ltd.*, 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004).

"A judgment pursuant to Rule 52(c) is appropriate where the plaintiff fails to make out a prima facie case or where the Court determines that 'the preponderance of the evidence goes against the plaintiff's claim.'" *Ackerman v. Pilipiak*, 457 B.R. 191, 198 (E.D.N.Y. 2011) (quoting *Matis v. U.S.*, 236 B.R. 562, 569 (E.D.N.Y. 1999)). Unlike Rule 50, "under Rule 52(c), the court does not consider the evidence in the light most favorable to the non-moving party, but rather weighs the evidence, resolves any conflicts and determines for itself where the preponderance of evidence lies." *Pal v. N. Y. Univ.*, No. 06-CV-5892 (PAC) (FM), 2013 WL 4001525, at *7 (S.D.N.Y. Aug. 6, 2013).

## II. Plaintiffs' FLSA Claims

Employees "engaged in commerce or in the production of goods for commerce," or "employed in an enterprise engaged in commerce or in the production of goods for commerce" may seek recovery under the FLSA's overtime and minimum wage provisions. *See* 29 U.S.C. §§ 206(a), 207(a)(1). An employer is subject to overtime and minimum wage provisions under the FLSA if "either (1) its employees are 'engaged in commerce' or (2) the employer is an 'enterprise engaged in commerce.'" *See D'Arpa v. Runway Towing Corp.*, No. 12-CV-1120 (JG) (RER), 2013 WL 3010810, at *13 (E.D.N.Y. June 18, 2013) (quoting *Jacobs v. N.Y. Foundling Hosp.*, 483 F. Supp. 2d 251, 257 (E.D.N.Y. 2007). "These two distinct types of coverage are respectively referred to as 'individual coverage' and 'enterprise coverage.'" *Id*. Plaintiffs allege that they are entitled to unpaid overtime and minimum wage payments under the FLSA's enterprise coverage. (Dkt. No. 1, Compl. ¶¶ 35-43.)

6

An enterprise is "engaged in commerce or in the production of goods for commerce" if it "has employees engaged in commerce or in the production of goods for commerce," or if it "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," and its "annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A)(i)-(ii); *see also* 29 C.F.R. § 779.238 ("An enterprise . . . regularly and recurrently has *at least two or more employees* engaged in [commerce].") (emphasis added).

Therefore, to establish enterprise liability under the FLSA, Plaintiffs must prove by a preponderance of the evidence that Defendants had more than one employee engaged in interstate commerce. *See Huerta v. Bakery*, No. 10-CV-4754 (RJD) (JO), 2012 WL 1100647, at *8 (E.D.N.Y. Feb. 17, 2012), *report adopted as modified by,* 2012 WL 1107655 (E.D.N.Y. Mar. 30, 2013); *see also Ford v. Sharp*, 758 F.2d 1018, 1022 (5th Cir. 1985) ("The [FLSA] simply requires more than one employee."); *Quezada v. Sante Shipping Lines, Inc.*, No. 11-CV-23246, 2013 WL 1334516, at *6 (S.D. Fla. Mar. 29, 2013) ("[A] single employee who is directly engaged in commerce is not enough."); *Genarie v. PRD Mgmt., Inc.*, No. Civ.A. 04-2082 (JBS), 2006 WL 436733, at *6 (D.N.J. Feb. 17, 2006) ("[A]n enterprise is covered by the FLSA if two or more employees are directly engaged in commerce.") (citing 29 U.S.C. § 203(s)(1)(A)(i)); *Walker v. Washbasket Wash & Dry*, No. 99-CV-4878, 2001 WL 770804, at *6 (E.D. Pa. Jul. 5, 2001) ("To be an 'enterprise' under the FLSA the business must have had, in the relevant annual periods, at least two or more employees regularly and recurrently engaged in its activities.") (citing 29 C.F.R. § 779.238).

Here, Plaintiffs failed to establish that Defendants regularly and recurrently had more than one employee engaged in interstate commerce. Not only did Suh testify that he was Defendants' only employee, but Plaintiffs' attempt to recast defendant John Kim as an employee is also unavailing. At trial, Plaintiffs established that John Kim participated in their hiring, supervised their work, and self-identified as the complex's managing agent in two documents. Based on this proof, Plaintiffs have, at best, established that John Kim was an "employer" under the FLSA. *See* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer."); *Perez v. Westchester Foreign Autos, Inc.*, No. 11-CV-6091 (ER), 2013 WL 749497, at *6 (S.D.N.Y. Feb. 28, 2013) ("[A]n entity [or individual] may be held liable under the FLSA as an employer if, as a matter of 'economic reality,' the entity functions as an individual's employer.") (quoting *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003)). To that end, I conclude that Defendants had only one employee during Lee's and Suh's consecutive terms as the complex superintendent. Accordingly, judgment must be entered in favor of Defendants on Plaintiffs' FLSA claim because Plaintiffs have failed to prove that Defendants were an enterprise engaged in interstate commerce.

### III. Plaintiffs' NYLL Claims

The NYLL implementing regulations contain a "janitor" exemption to the general overtime and minimum wage requirements for building service industry employees. N.Y. Comp. R. & Regs. tit. 12, § 141-1.2; Notices of Adoption, 2010 NY REG TEXT 203716 (NS) (N.Y. Dep't of Labor Jan. 6, 2010); *see also Niemiec v. Ann Bendick Realty*, No. 04-CV-00897 (ENV) (KAM), 2007 WL 5157027, at *4 n.6 (E.D.N.Y. Apr. 23, 2007) ("[T]he NYLL implementing

regulations do not provide for either minimum wages or overtime wages for 'janitors,' who are instead paid based on the number of units in the building in which they work.").

Under the NYLL, a "janitor" is defined as "a person employed to render any physical service in connection with the maintenance, care or operation of a residential building." Title 12 N.Y. Comp. R. & Regs. § 141-3.4. "Janitors" are entitled to the following unit-based weekly wages:

> For buildings with any number of units, resident or non-resident janitor and any type of heating--rate per unit per week:
>
> (a) $3.45 on and after March 31, 2000;
>
> (b) $4.00 on and after January 1, 2005;
>
> (c) $4.50 on and after January 1, 2006;
>
> (d) $4.80 on and after January 1, 2007;
>
> (e) $4.85 on and after July 24, 2009.

Title 12 N.Y. Comp. R. & Regs. § 141-1.2. Unit pay for "janitors" is capped at $304.10 per week, on and after January 1, 2007, and $308.35 per week, on and after July 24, 2009. *See* Title 12 N.Y. Comp. R. & Regs. § 141-2.8.

Both Lee and Suh testified that they performed the type of maintenance services contemplated by the NYLL "janitor" exemption. Further, during their respective tenures as complex superintendent they were the only such employees, as there was no testimony that John Kim performed the type of "maintenance, care, or operation" tasks specific to "janitors." Moreover, even if John Kim was deemed a building employee, Lee and Suh lived in the complex and therefore would be deemed "janitors" based on the portion of the regulation addressing

buildings with multiple service employees. Title 12 N.Y. Comp. R. & Regs. § 141-3.4 ("Where there is more than one employee in the building, *the employer shall designate an employee who lives in the building as the janitor*.") (emphasis added).

Accordingly, under the NYLL's per-unit wage regime, Lee is entitled to $187.20 per week from May 1, 2009 to July 23, 2009, and $189.15 per week from July 24, 2009 to December 31, 2009, the date of his resignation. Similarly, Suh is entitled to $189.15 per week from January 1, 2011 to October 1, 2011, the effective date of his termination. Since Lee and Suh both testified that they were paid at least $225 per week,[2] which is more than the required per-unit wage for "janitors" in thirty-nine unit residential buildings, judgment must be entered in favor of Defendants on Plaintiffs' NYLL claim.

## **CONCLUSION**

Based on the foregoing, Defendants' Rule 52(c) motion is granted as to Plaintiffs' FLSA and NYLL claims. The Clerk of the Court is respectfully requested to close the case.

**SO ORDERED**.

Dated: August 27, 2013
Brooklyn, New York

*Ramon E. Reyes, Jr.*
**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**

---

[2] The Court deducts the $25 in required church tithes from Suh's weekly pay.